FILED 27 APR '21 14:23 USDC-ORE

**Jennifer J. Middleton**, OSB No. 071510
jmiddleton@justicelawyers.com
**Caitlin V. Mitchell**, OSB No. 123964
cmitchell@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLETON PC
975 Oak Street, Suite 1050
Eugene, OR 97401
Tel: 541-484-2434
Fax: 541-484-0882
Attorneys for Relator

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No.: 1:21-cv-636-mc |
| Plaintiff, | |
| *ex rel.* **RELATOR NICHOLAS ENGSTROM,** | **FILED UNDER SEAL** Pursuant to 31 U.S.C. § 3730(B)(2) |
| Relator, | **COMPLAINT** False Claims Act, 31 U.S.C. § 3729 *et seq.* |
| v. | Demand for Jury Trial |
| **ASANTE, ASANTE PHYSICIAN PARTNERS, and Dr. CHARLES CARMECI,** | **DO NOT POST ON PACER** |
| Defendants. | |

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE *QUI TAM* PROVISIONS OF THE
## FALSE CLAIMS ACT

### NATURE OF THE ACTION

**1.**

Relator Dr. Nicholas Engstrom ("Relator" or "Dr. Engstrom") brings this action on behalf

of the United States of America to recover damages and civil penalties for false claims presented,

or caused to be presented, by Defendants Asante, Asante Physician Partners, and Dr. Charles
Carmeci to the United States.

## 2.

This action arises under Title 31 U.S.C. § 3729 *et seq*., known as the False Claims Act
("FCA"), to recover treble damages and civil penalties on behalf of the United States for false or
fraudulent claims Defendants made, or caused to be made, for reimbursement from government-
funded healthcare programs including, without limitation, Medicare, Medicaid, the Federal
Employees Health Benefits Program, and TRICARE ("government healthcare programs").

## 3.

Relator has extensive documentation and first-hand knowledge demonstrating that
Defendants are billing the United States for services not performed or inflating services actually
performed; billing for medically unnecessary services; and improperly "unbundling," which is
billing for procedures separately that are normally covered by a single, comprehensive fee.

## 4.

Defendants submitted, or caused to be submitted, claims for reimbursement to federal
government healthcare programs in violation of the False Claims Act.

## **JURISDICTION AND VENUE**
## 5.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a),
which specifically confers jurisdiction to this Court over actions brought pursuant to 31 U.S.C.
§§ 3729 and 3730.

## 6.

This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a)
because acts prohibited by 31 U.S.C. § 3729 occurred in this state and this judicial district.

Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one act

proscribed by 31 U.S.C. § 3729 occurred in this district.

## PRELIMINARY STATEMENT

### 7.

In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed under seal and will

remain under seal for a period of 60 days or more from its filing date or such other date as the

Court so orders, and shall not be served upon the Defendant unless the Court so orders.

### 8.

This suit is not based upon prior public disclosure of allegations or transactions in a

criminal, civil, or administrative hearing, lawsuit or investigation, in a Government

Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news

media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730

(e)(4)(A). In addition, before filing this Complaint, Relator affirmatively disclosed the

allegations herein to the CMS Office of Inspector General, the FBI, and the United States

Department of Justice.

### 9.

To the extent that there has been a public disclosure of the information upon which the

allegations of this Complaint are based that is unknown to Relator, Relator is an "original

source" of this information as defined in 31 U.S.C. § 3730(e)(4)(B).

### 10.

Relator has direct and independent knowledge of the information which he acquired

through his employment with Defendants.

**11.**

As detailed below, Relator voluntarily provided the government with this information

prior to filing this action. *See* 31 U.S.C. § 3730(e)(4).

## PARTIES

**12.**

Relator Dr. Nicholas Engstrom, MD is a cardiothoracic surgeon, former employee of

Asante and former member of Asante Physician Partners.

**13.**

Defendant Asante is a domestic nonprofit corporation organized, existing, and doing

business under the laws of the State of Oregon. It is the largest healthcare provider in the region

and its facilities include Asante Rogue Regional Medical Center, where its cardiothoracic

practice is located. Asante submits to the federal government bills for services provided by Dr.

Carmeci to patients enrolled in government healthcare programs.

**14.**

Defendant Asante Physician Partners is Defendant Asante's medical group for providers

and partner practices.

**15.**

Defendant Dr. Charles Carmeci, MD is a cardiothoracic surgeon, employee of Asante and

member of Asante Physician Partners. He is a former co-worker of Dr. Engstrom in the

cardiothoracic surgery service at Asante. A significant portion of Dr. Carmeci's patients are

billed through Medicare, Medicaid, or other federal government healthcare programs.

## REGULATORY FRAMEWORK

**A.      Federal and State Government Healthcare Programs**

**16.**

The federal government, through its government healthcare programs, is one of the principal payors for Dr. Carmeci's services.

**17.**

Medicare is a federal government health program primarily benefitting the elderly created by Congress in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

**18.**

Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act. Medicaid is a public assistance program that provides payment of medical expenses to low-income patients. Funding for Medicaid is shared between the federal government and those state governments participating in the program. The federal government also separately matches certain state expenses incurred in administering the Medicaid program. Medicaid's coverage and reimbursement requirements are generally modeled after Medicare's coverage.

**19.**

Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

**20.**

The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage to more than 8 million federal employees, retirees and their dependents. FEHBP is a collection of individual health care plans including

BlueCross/Blue Shield plans, Government Employees Hospital Association, and Rural Carrier Benefit Plan.

**21.**

TRICARE is a federal program which provides civilian health benefits for military personnel, certain military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government. TRICARE regulations relating to coverage of claims by providers and physicians are substantially similar in all material respects to the applicable Medicare provisions described below.

**22.**

Medical treatment and services by physicians that are reimbursable under the Medicare and Medicaid Programs must be reasonable and medically necessary. The physician or entity seeking reimbursement, including Defendants herein, must meet certain obligations to participate as a Medicare provider, including the following duties to:

    a.    Bill for only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A);

    b.    Not make false statements or misrepresentations of material facts concerning requests for payment. 42 U.S.C. § 1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a;

    c.    Provide economical medical services, and then, only where medically necessary. 42 U.S.C. § 1320c-5(a)(1);

    d.    Provide evidence that the service given is medically necessary. 42 U.S.C. § 1320c-5(a)(3);

    e.    Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. § 1320a-7(b)(6) & (8);

    f.    Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. § 1320a-7(b)(6)(A);

    g.    Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B).

**23.**

The Social Security Act provides that no Medicare payment may be made for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(l)(A). Accordingly, to lawfully bill Medicare for services, the documentation regarding such services must adequately establish reasonableness and medical necessity.

**24.**

Providers, including hospitals and physicians, submit claims to government healthcare programs on a CMS Form 1500 Health Insurance Claim Form ("Form 1500"). Form 1500 requires a signature from the provider seeking reimbursement certifying that "the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

**25.**

Providers must be enrolled in Medicare in order to be reimbursed by the Medicare program. *See* 42 C.F.R. § 424.505. To enroll in Medicare, institutional providers such as hospitals periodically must complete a Medicare Enrollment Application (often called a Form CMS-855A). In completing the Medicare Enrollment Application, an institutional provider certifies:

> I agree to abide by the Medicare laws, regulations and program instructions
> that apply to this provider. The Medicare laws, regulations, and program
> instructions are available through the Medicare contractor. I understand that
> payment of a claim by Medicare is conditioned upon the claim and the
> underlying transaction complying with such laws, regulations, and program
> instructions (including, but not limited to, the Federal anti-kickback statute and
> the Stark Law), and on the provider's compliance with all applicable
> conditions of participation in Medicare.

**26.**

The Medicare Enrollment Application also summarizes the False Claims Act in a separate

section that explains the penalties for falsifying information in the application to "gain or maintain

enrollment in the Medicare program."

**B.**     **The False Claims Act**

**27.**

Originally enacted in 1863, the FCA was substantially amended in 1986 by the False

Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover

losses sustained as a result of fraud against the United States. Congress again strengthened the

law with additional amendments in 2009 and 2010. The 2009 amendments expanded defendant

liability, strengthened retaliation protections, and made it easier for federal, state, and local

governments to prosecute FCA actions. The 2010 amendments clarified the definition of who is

an "original source" of a FCA disclosure.

**28.**

The FCA provides that any person who knowingly presents or causes another to present

a false or fraudulent claim to the United States Government for payment or approval is liable for

a civil penalty of not less than $11,665 and up to $23,331 for each such claim, plus three times

the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1), (2), (7).  The

FCA empowers private persons who have information regarding a false or fraudulent claim

against the government to bring an action on behalf of the Government and to share in any

recovery. The FCA complaint must be filed under seal without service on any defendant. The

complaint remains under seal while the United States conducts an investigation of the allegations

in the complaint and determines whether to join the action.

**29.**

Billing Medicare or Medicaid for services not provided or inflating the services provided in order to increase payment, charging for medically unnecessary services, and charging more than once for the same service are all fraudulent claims for payment in violation of the FCA.

**C.      CPT Codes and wRVUs**

**30.**

The Current Procedural Terminology (CPT) system provides a standard language and numerical coding methodology to accurately communicate the medical, surgical, diagnostic, and therapeutic services undertaken by health care providers. The CPT descriptive terminology and associated code numbers are the nomenclature used to report medical procedures and services for processing claims for payment.

**31.**

Since January 1, 1992, the Center for Medicare Services (CMS) has paid for physicians' services under section 1848 of the Social Security Act, "Payment for Physicians' Services" (PFS). The PFS relies on national relative values that CMS establishes for work, practice expense, and malpractice insurance, and adjusts for geographic cost variations. These values are multiplied by a conversion factor to convert the "relative value units" (RVUs) into payment rates. CMS updates and revises these RVUs regularly.

**32.**

The work component of physicians' services means the portion of the resources used in furnishing the service that reflects physician time and intensity. A research team at the Harvard School of Public Health developed the original work RVUs (wRVUs) applicable to most CPT

codes under a cooperative agreement with the Department of Health and Human Services (HHS), and CMS revises them regularly.

### 33.

CMS assigns a wRVU to each CPT code. The wRVU is meant to measure the relative value of the work required to perform the service described by the CPT code.

### 34.

Asante's compensation of Dr. Carmeci and Dr. Engstrom was based primarily on the number of wRVUs they generated each year.

### FACTUAL ALLEGATIONS

### 35.

Dr. Nick Engstrom began work for Defendant Asante on July 27, 2015. He joined Asante Physician Partners as one of three cardiothoracic surgeons working out of Asante Rogue Regional Medical Center. In 2019 the third surgeon retired, and Dr. Engstrom and Dr. Carmeci remained as the only two cardiothoracic surgeons in the practice. They were paid as 50% partners so each received half of the total amount that the two of them collectively billed.

### 36.

In mid-to-late 2019, nurses from the operating room told Dr. Engstrom that Dr. Carmeci was adding surgical procedures to the case records that were not actually being completed. Separately, an anesthesia colleague discussed with Dr. Engstrom a case in which both pre-operative and intra-operative echocardiogram evidence showed that there was no "patent foramen ovale" (PFO) (a hole between the chambers of the heart), but Dr. Carmeci nevertheless charged the patient for a PFO closure.

**37.**

In January 2020 Chris Davis a physician's assistant on Dr. Engstrom's service, told Dr.

Engstrom about a case in which Dr. Carmeci removed three stitches from a patient and falsely

billed it as a hernia revision. The nurse involved, Marie Hausman, agreed that the procedure was

falsely coded. She told Dr. Engstrom that she knows what Dr. Carmeci is doing and hopes he

stops before getting caught.

**38.**

Dr. Carmeci encouraged Dr. Engstrom to change his billing practices to increase

payments. For example, it is a common practice in heart or lung surgeries to leave tubes in the

patient to evacuate air and fluid in the post-operative period. The tubes themselves are not

separately billable; they are part of the charge for the operation. Dr. Carmeci told Dr. Engstrom

to start using more Pleurx catheters. Those catheters are rarely used, specialty items for certain

types of surgery. Pleurx catheters can be billed separately for hundreds of dollars per tube. Dr.

Carmeci was falsely claiming that the regular chest tubes he used in surgery were Pleurx

catheters.

**39.**

Similarly, Dr. Carmeci approached Dr. Engstrom and told him to "find more holes"

inside the heart. Dr. Carmeci told Dr. Engstrom that closing such holes increases the wRVUs

significantly for a procedure when a physician adds it to another surgery.

**40.**

Dr. Carmeci pulled Dr. Engstrom aside one day and said to him, "you know if you take

out a small piece of pericardium and send it to path[ology] you can bill for a partial

pericardiectomy." Dr. Engstrom asked how large a specimen he would need to send. Dr. Carmeci

responded, "just send a small chunk and that way it's on record at path and no questions will be asked." Unnecessarily "taking out" a small piece of the pericardium for a review by the pathology department is not the same as a partial pericardiectomy procedure, which is a surgical procedure of its own.

### 41.

Dr. Carmeci suggested this scheme to bill for a procedure that was both unnecessary and not actually performed as described. Upon information and belief, Dr. Carmeci was pursuing this scheme in his own practice.

### 42.

Dr. Engstrom asked Dr. Carmeci about why he was suggesting these billing schemes. Dr. Carmeci responded, "it's a game to me. I want to get paid $2 million a year."

### 43.

Kali Carroll was one of the Asante nurses who came to Dr. Engstrom around 2019. She complained to Dr. Engstrom about Dr. Carmeci removing chunks of fat or lymph node from the mediastinal region and billing it as a mediastinal mass resection.

### 44.

Dr. Engstrom noticed that Dr. Carmeci was performing aortic aneurysm surgeries for patients where it was not indicated based on their clinical records. An aortic aneurysm surgery is a highly reimbursed surgery. One of the patients that Dr. Carmeci took in for aortic surgery did not meet the clinical criteria for the surgery and died from the operation.

### 45.

Dr. Engstrom took over all services for the practice while Dr. Carmeci took the holidays off in December 2019. In reviewing Dr. Carmeci's cases, Dr. Engstrom found instances in which procedures that should never be done together were billed on the same day for the same patient.

**46.**

He also noticed that Asante sometimes billed for an "assist" by Dr. Carmeci during Dr.

Engstrom's surgeries even though Dr. Carmeci was only present for a few minutes and did not

actually assist. Dr. Carmeci would walk into the operating room and tell the nurses to make sure

they marked down in the records that he was there. Asante would then fraudulently bill for him

assisting in the surgery.

**47.**

Dr. Engstrom also noticed billing in Dr. Carmeci's cases for a "decortication," which is a

removal of the outer layer or membrane around the lung, in patients where the indicated

procedure was a pleurodesis or a diagnostic thoracoscopy. Decortication is billed at a higher rate

than the other procedures. He also noticed bills that added a talc pleurodesis to a decortication,

but a surgeon never uses talc for any reason when doing a decortication. It can be harmful to the

patient.

**48.**

When Dr. Carmeci returned to work in 2020, Dr. Engstrom tried to talk with him about

these cases and the concerns brought to him by nurses and anesthesia providers. Dr. Engstrom

told him that he no longer wanted to be a part of sharing the proceeds of the practice with these

billing standards. Instead of trying to explain to Dr. Engstrom what had happened in the

individual cases, Dr. Carmeci demeaned the nurses, said that Dr. Engstrom should not pay

attention to them and that his practices were "defendable in court." This was not reassuring to

Dr. Engstrom.

**49.**

A few weeks later, Asante's Chief Medical Officer and quality officer, Jamie Grebosky,

MD, stopped in on Dr. Engstrom. He had heard that Dr. Engstrom was looking for employment

elsewhere. Grebosky told Dr. Engstrom that he is an excellent surgeon and asked what Asante needed to do to keep him. Dr. Engstrom said that he needed to have his compensation separated from Dr. Carmeci's.

**50.**

Grebosky scheduled a follow-up meeting with both Dr. Engstrom and Dr. Carmeci on January 21, 2020. Dr. Engstrom reported to Grebosky in this meeting, in front of his partner Dr. Carmeci, that he believed Dr. Carmeci was committing Medicare fraud and performing unindicated and unnecessary surgeries in order to increase his compensation.

**51.**

On January 29, 2020, Dr. Engstrom followed up with an email to Asante's Vice President of Operations Kristi Blackhurst detailing some of his observations about fraudulent billing.

**52.**

In early February, Dr. Carmeci tried to take a 60 year old to the operating room for an aneurysm that was 5.1 cm. Indications for that surgery require that the aneurysm be 5.5 cm before warranting surgery. Stephanie Baker, Office Manager for the practice, questioned the procedure and asked Dr. Engstrom to review the record. Dr. Engstrom confirmed that surgery was not appropriate for that patient. Hospital risk management had to be contacted to cancel the operation. Dr. Carmeci blamed a member of the office staff, scheduler Jen Edwards, for not showing him the CT scan, but Ms. Edwards' records reflected that she had shown Dr. Carmeci the CT scan.

**53.**

Because Dr. Engstrom was regularly on call, he had to review the patient charts and notes for Dr. Carmeci's patients when he was responsible. He found more fraudulent billing. For

example, Dr. Engstrom noticed instances in which Dr. Carmeci wrote in the operative note (which is what the Asante coders review):

      1. Ascending aorta replacement (33858 or 33859)

      2. Aortic valve replacement (33405)

This is a procedure that is done on occasion by a cardiac surgeon. It is a high wRVU procedure, and the reimbursement rate is significant. But Dr. Carmeci would then dictate in the treatment note the exact description of 33863, a Bentall procedure. That procedure has similar components as the two procedures above but it generates fewer wRVUs. Dr. Carmeci explained to Dr. Engstrom that because of the lower reimbursement for 33863 (the correct CPT code for a Bentall procedure), he uses the two codes above instead.

54.

The office manager, Stephanie Baker, told Dr. Engstrom that Dr. Carmeci came to her with these surgeries to check if the Asante coding system had changed the code to 33863 (the Bentall procedure), and if so, he would have her change it back so that he would be paid more.

55.

Dr. Engstrom went back over bills from the practice from prior years. He found more examples of fraud and/or improper billing practices. Several cases included charges for Pleurx catheters in procedures that do not normally call for their use. He also noted an exceedingly high number of ASD (atrial septal defect) or PFO (patent foramen ovale) closures, which are closures of holes in the heart. Dr. Engstrom had never seen that many patients with holes in their hearts.

56.

On December 5, 2017, Dr. Carmeci performed a pneumonectomy (32440 CPT code). When a cardiothoracic surgeon removes an entire lung, they staple or tie off the blood vessels so

the lung can be removed. They do not repair the blood vessels. Yet Dr. Carmeci added a blood vessel repair procedure (35216 CPT code) to his charges. This blood vessel repair earned 36 wRVUs, while the underlying procedure was 27 wRVUs. Either there was no blood vessel repair in this procedure, or Dr. Carmeci accidentally nicked a vessel and had to repair it. If it was an accidental nick, it is not billable because it is the surgeon's own error.

### 57.

In June 2019, Dr. Carmeci logged 3124 wRVUs from operating. On an annual basis, this rate would result in over 37,000 wRVUs. Hospital management has told Dr. Engstrom that according to data from the Medical Group Management Association (MGMA), the average heart surgeon in the United States logs 7500 wRVUs per year.

### 58.

Dr. Engstrom noted the following examples from June 2019 that he found highly suspect and demonstrate likely fraud in Dr. Carmeci's practice:

1)      June 17, 2019: Procedure was a coronary artery bypass redo and replacement of the mitral valve. Also billed in this procedure were closing of an atrial septal defect (ASD) and a partial pericardiectomy. If Dr. Carmeci approached the mitral valve through the septum of the heart, then closing that incision is not closing of an ASD and should not be billed as one. Likewise, Dr. Engstrom suspected that the partial pericardiectomy was billed as an add-on in the way Dr. Carmeci had suggested to Dr. Engstrom, in order to boost wRVUs (see paragraph 40).

2)      June 21, 2019: Dr. Carmeci bills for decortication, pleurodesis and Pleurx catheter placement.  Dr. Engstrom has never heard of these three procedures being performed in the same operation. If Dr. Carmeci decorticated the lung then pleurodesis is not needed and in some cases if talc is used (which it normally is in a pleurodesis, but not a decortication) it could elevate the

risk to the patient. Dr. Engstrom suspected that Dr. Carmeci did not do a decortication and that

he used talc for the pleurodesis.

3)    June 23, 2019: Patient underwent a second heart surgery for tricuspid

replacement. Dr. Carmeci also billed for removing a mass from the heart and closing an ASD,

among other things. Dr. Engstrom noted that if there was a mass hanging from the septum

(which is the most common position for such a mass), then closing the hole that is created by

removing the mass is not closing an ASD. It is a part of the mass resection procedure and should

not be separately billed.

**59.**

After Asante received Dr. Engstrom's reports about Dr. Carmeci's fraudulent billing in

the January 2020 email, Chief Medical Officer Grebosky asked Dr. Engstrom to come to his

office. The Vice President of Quality, Scott Wilbur was also present. Grebosky and Wilbur did

not address Dr. Engstrom's concerns and instead accused Dr. Engstrom of committing HIPAA

violations because he knew so much about Dr. Carmeci's patients.

**60.**

Dr. Engstrom explained that he reviews records on every patient that gets scheduled for

an operation in their practice because he regularly cross-covers for Dr. Carmeci, as his only

partner. He therefore needs to know the status of each patient. Grebosky and Wilbur did not

pursue the HIPAA accusation, but Dr. Engstrom began to feel that he was now being targeted.

**61.**

In June 2020, CMO Grebosky called Dr. Engstrom at home. Dr. Engstrom was on leave

because his son had just been born. Grebosky berated Dr. Engstrom for his treatment of a tech in

the operating room, without conducting any peer review of the incident. Once peer review was

completed, Dr. Engstrom was found to have acted properly.

Page 17 - **COMPLAINT**

**62.**

Dr. Engstrom continued to find examples of fraud through 2020. In one instance, a patient of Dr. Engstrom's required surgery when Dr. Engstrom was on parental leave. Dr. Carmeci performed the surgery, which was a mitral valve replacement with a Bentall procedure. Dr. Carmeci fraudulently billed for a mitral valve replacement with ascending aorta replacement and aortic valve replacement, when what he actually did was the Bentall procedure. This is one of the same schemes that Dr. Engstrom had noticed in prior patients treated by Dr. Carmeci (see paragraph 53).

**63.**

Dr. Engstrom reported this fraudulent charge to CMO Grebosky. On information and belief, Grebosky took no corrective action.

**64.**

Tami Correiro handles tracking and documenting services and devices used in surgeries for Asante Rogue Regional Medical Center. One of the operating room nurses, Staci Ostrom, told Dr. Engstrom that around spring 2020, Correiro asked operating room nurses why they had not documented the Pleurx catheters that Dr. Carmeci billed for in his surgeries. The nurses told her they were not documented because they were not used. On information and belief, no corrective action was taken.

**65.**

Dr. Engstrom lost confidence in Asante's willingness to address Dr. Carmeci's billing practices and notified appropriate federal authorities. He contacted the Office of Inspector General for CMS and the FBI. He has continued to provide information to the FBI since June 2020 about Dr. Carmeci's fraudulent schemes.

**66.**

Asante received notice of a criminal investigation into Dr. Carmeci in July 2020. It was not until then that Asante asked Dr. Engstrom to meet with its legal team to go over the allegations he had made seven months earlier.

**67.**

Asante increased its efforts to recruit a new cardiothoracic surgeon. One candidate was Dr. Joseph Rowe. Dr. Joseph Rowe contacted Dr. Engstrom after his interview. He said that Asante had discredited Dr. Engstrom during the interview and said he might not be at Asante much longer.

**68.**

Asante offered Dr. Rowe a position. Dr. Rowe asked Asante for billing data from the department. Like Dr. Engstrom, Dr. Rowe found several discrepancies with it and alerted Asante of his findings. He did not take the job.

**69.**

CMO Grebosky was angry with Dr. Engstrom for talking to prospective hires about his concerns with the billing. Grebosky also told Dr. Engstrom that Asante had received multiple complaints from CCU nurses about Dr. Engstrom. Grebosky refused to provide any documentation and asked Dr. Engstrom if he planned to leave Asante.

**70.**

Dr. Engstrom asked CCU director Kelly Thomas whether there were complaints about him from CCU nurses. Thomas said there were none. She explained that Dr. Carmeci had alleged that nurses had complaints about Dr. Engstrom, so she and Grebosky held a meeting with the charge nurses. None had complaints about Dr. Engstrom.

### 71.

In or around September 2020, the hospital's morbidity and mortality review panel

discussed one of Dr. Carmeci's cases who died after an aortic aneurysm surgery. Dr. Carmeci's

patients were a frequent topic in these meetings. Dr. Engstrom offered his opinions on the case in

a professional manner. CMO Grabosky contacted Dr. Engstrom after the meeting and told him

that he should not discuss Dr. Carmeci's cases at the morbidity and mortality reviews when Dr.

Carmeci was not there.

### 72.

On November 12, 2020, CMO Grebosky called Dr. Engstrom and accused him of

crippling Asante's ability to recruit a new cardiothoracic surgeon. He falsely accused Dr.

Engstrom of telling every candidate of the FBI's criminal investigation of Asante. Dr. Engstrom

had no knowledge of any criminal investigation into Asante at that point and had not spoken with

most candidates. He only knew of an FBI investigation into Dr. Carmeci.

### 73.

In December 2020, Grebosky called to berate Dr. Engstrom again. Now he said he had a

complaint that Dr. Engstrom grabbed a nurse forcibly in the operating room, and that some

physician assistants said he was not communicative with them. Dr. Engstrom told Grebosky

these allegations were absolutely false and asked him to investigate and follow up. No

investigation was undertaken.

### 74.

In January 2021, CMO Grebosky contacted Dr. Engstrom with yet another complaint.

This time it was that Dr. Engstrom kept a weapon on campus. Dr. Engstrom had no idea what he

meant. Grebosky said he investigated and found it true, that it was an extremely serious issue,

and that the weapon had to be removed immediately. The "weapon" was a small, engraved keepsake pocketknife that a patient had given Dr. Engstrom in thanks for saving his life. It said "Blessed" in the engraving. Dr. Engstrom kept it in his loupe box in the operating room as a reminder.

**75.**

Dr. Engstrom, who has access to and uses extremely sharp instruments supplied by his employer daily in the course of his work, was ordered to remove the pocketknife from campus.

**76.**

The harassment and excessive scrutiny that Dr. Engstrom experienced as soon as he reported fraudulent billing was escalating. Dr. Engstrom feared that Asante's management might create an allegation that would affect his license. He had no reasonable option but to find another position and leave Asante. Dr. Engstrom has incurred considerable personal cost to himself and his family from his reports.

**77.**

Dr. Engstrom's last day was February 11, 2021. Dr. Carmeci remains at Asante. As far as Dr. Engstrom knows, Asante has not taken steps to change Dr. Carmeci's billing practices.

**78.**

Dr. Engstrom has now begun a new position at McKenzie-Willamette Medical Center in Eugene.

**FIRST CLAIM FOR RELIEF**

**False Claims Act - Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

The allegations of the preceding paragraphs are realleged as if fully set forth herein.

**79.**

Through the acts described above and otherwise, Defendants and their agents and employees knowingly presented or caused to be presented to the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

**80.**

Defendants submitted false claims by billing for medical services not provided or inflating those provided, including but not limited to:

- Billing for closing an ASD or PFO when there was no ASD or PFO present.

- Billing for decortication when that was not the procedure performed.

- Billing for ascending aorta replacement (33858 or 33859) and aortic valve replacement (33405) when a Bentall procedure (33863) was actually performed.

- Billing for Pleurx catheters when they were not used.

- Billing a stitch removal as a hernia removal.

- Billing for partial pericardiectomies when that was not the procedure performed.

- Billing for an "assist" when no assistance was provided.

- Removing sections of lymph nodes or fat and billing for mediastinal mass resection.

**81.**

Defendants submitted false claims by unbundling procedures, including but not limited to:

- Charging for mass removal and ASD closure when the closure is included in the procedure code for removal of the mass;

•     Charging for blood vessel repair when the repair is already contained in the charge for the underlying procedure, such as a lung removal.

**82.**

Defendants submitted false claims by performing unnecessary procedures, including but not limited to:

•     Performing heart surgeries that were not indicated by the clinical guidelines;

•     Removing pericardium unnecessarily and billing for partial pericardectomy.

**83.**

Defendants submitted false claims by making false representations about repairing blood vessels when the repair, if there was one, was caused by the surgeon's own mistake and therefore unbillable.

**84.**

Defendant Asante knew or should have known of the false claims throughout the time that Dr. Carmeci perpetrated them. It knowingly or recklessly participated in them. Dr. Engstrom made Asante aware of the fraudulent schemes and consequential false claims and Asante continued to submit them.

**85.**

The United States of America, unaware of the falsity of the claims, and in reliance on the accuracy of these claims and statements, paid and is continuing to pay or reimburse false claims for patients enrolled in federally-funded medical care programs.

**86.**

The United States of America has been damaged in amounts to be determined at trial, and is entitled to statutory penalties.

## SECOND CLAIM FOR RELIEF

**False Claims Act - Making or Using False Records
or Statements to Cause Claim to be Paid
31 U.S.C. § 3729(a)(1)(B)**

The allegations of the preceding paragraphs are realleged as if fully set forth herein.

### 87.

Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B), in order to have false or fraudulent claims paid and approved by the United States Government.

### 88.

The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and is continuing to pay or reimburse false claims for patients enrolled in federally-funded medical care programs.

### 89.

The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

### 90.

Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendants' statements and actions.

**91.**

As a direct result of Defendant's actions as set forth in the Complaint, the United States of America has been damaged, with the amount to be determined at trial, and is also entitled to statutory penalties.

### THIRD CLAIM FOR RELIEF
### False Claims Act – Conspiracy to Defraud the United States
### 31 U.S.C. § 3729(a)(1)(C)

The allegations of the preceding paragraphs are realleged as if fully set forth herein.

**92.**

Defendants combined, conspired, and agreed together with each other to defraud the United States by knowingly causing false or fraudulent claims to be presented for payment or approval and knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, and ultimately profited from those false claims. Defendants committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(1)(B), causing damage to the United States.

**93.**

Compliance with applicable federal laws and regulations cited herein is a material condition of payment of claims for payment or approval.

**94.**

Had the United States known that Defendants were violating the federal laws and regulations cited herein, it would not have paid the claims caused by Defendants' fraudulent and illegal practices.

**95.**

As a result of Defendants' violations of 31 U.S.C. §3729(a)(1)(C), the United States has been damaged in a significant amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator Dr. Nicholas Engstrom, acting on behalf of and in the name of

the United States of America and on his own behalf, prays that judgment be entered against

Defendants for violation of the False Claims Act as follows:

(a)      In favor of the United States against the Defendants for treble damages to the

federal government from the submission of false claims, and maximum civil penalties for each

violation of the False Claims Act, plus a civil penalty of not less than $5,500.00 and not more

than $11,000.00 for each violation of 31 U.S.C. § 3729 prior to November 2, 2015;

(b)      In favor of the United States against the Defendants for treble damages to the

federal government from the submission of false claims, and maximum civil penalties for each

violation of the False Claims Act, plus a civil penalty of not less than $10,781.00 and not more

than $21,563.00 for each violation of 31 U.S.C. § 3729 after November 2, 2015, pursuant to 81

Fed. Reg. 42491, 42494 (Jun. 30, 2016);

(c)      In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d)

to include reasonable expenses, attorney fees, and costs incurred by the Relator;

(d)      All other relief as this Court deems just and equitable.

DATED this 26th day of April, 2021.

JOHNSON JOHNSON LUCAS & MIDDLETON PC

/s/Jennifer J. Middleton
**Jennifer J. Middleton**, OSB No. 071510
jmiddleton@justicelawyers.com
**Caitlin V. Mitchell,** OSB No. 123964
cmitchell@justicelawyers.com
975 Oak Street, Suite 1050
Eugene, OR 97401
Tel: (541) 484-2434   Fax: (541) 484-0882
Attorneys for Relator